James P. **DOWLING**, Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE CO.,** Defendant.

No. 803CV2209T30MSS.

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 28, 2004.

William Francis Rutger, Rutger & Donaldson, Palm Harbor, FL, for Plaintiff.

Ralph C. Losey, Stephanie A. Segalini, Katz, Kutter, Alderman & Bryant, P.A., Orlando, FL, for Defendant.

## *ORDER*

MOODY, District Judge.

THIS CAUSE comes before the Court upon (i) Plaintiff's Motion for Summary Judgment (Dkt.# 23), (ii) Defendant's response thereto (Dkt.# 32), (iii) Defendant's Motion for Summary Judgment (Dkt.# 28), and (iv) Plaintiff's response thereto (Dkt.# 33). For the reasons outlined below, this Court finds that summary judgment should be entered in favor of Defendant.

### I. Background

This claim arises out of Defendant's termination of Plaintiff's long-term disability benefits which Plaintiff had been receiving under the employee benefit plan of his former employer Citibank[1] (the "Plan"). Plaintiff began receiving long term disability benefits on March 6, 1996, because of mental illnesses of severe depression and anxiety. Pursuant to the terms of the Policy, Plaintiff was required to continue treatment for his disability and remain disabled in order to continue receiving benefits.[2] Over the years, Plaintiff contin-

---

1. Citibank currently operates under the corporate heading Citigroup, Inc. ("Citigroup"), but this change of name is irrelevant for purposes of Plaintiff's ERISA claim. This Court uses the two names interchangeably in its Order without significance.

2. Article V, Section 5 of the Plan provides that a "Participant who is receiving ... Long–Term Disability Income shall obtain and adhere to a reasonable course of treatment ...," and Article IV, Section 4 provides that "payment of Long–Term Disability Income to a Participant shall terminate upon ... the date the Claims Administrator/Fiduciary determines that the Disability is terminated."

ued to be treated for his mental illness and continued receiving long-term disability benefits, despite apparent suspicions on the part of Defendant's predecessor CNA Insurance ("CNA") that his disability had subsided.[3]

Defendant began administering Citibank's disability policy at the beginning of 2002 and determined that Plaintiff no longer satisfied the Plan's definition of "disability" after receiving a completed psychological questionnaire form on January 7, 2003, from Plaintiff's treating physician, Dr. Brooks.[4] By letter dated January 10, 2003, Defendant informed Plaintiff that it was terminating his long-term disability benefits because "the medical records in [his] file [did] not address any limitations or restrictions, psychological or physical, which would preclude [him] from returning to work full time." Defendant's initial decision was based primarily, if not exclusively, on Dr. Brooks' conclusions in the questionnaire that Plaintiff was not receiving psychiatric treatment,[5] was not taking psychiatric medication, had a global assessment of functional ability ("GAF") score of 90–100,[6] had not been seen by Dr. Brooks since October 1, 2002, and could return to work immediately with "no restrictions." [7]

Defendant's termination letter prompted Plaintiff into action. Within a week of learning that his benefits were being terminated, Plaintiff met with Dr. Brooks for a follow-up evaluation. Plaintiff informed Dr. Brooks during this visit that his disability had been terminated and the reasons given for the termination. After learning this news, Dr. Brooks called Dr. Dorothy Dugger, a psychiatrist, to discuss Plaintiff's case. Dr. Brooks also sent a copy of the disability termination letter to Dr. Dugger and scheduled Plaintiff for an evaluation with her on February 10, 2003.

Immediately after his visit to Dr. Brook's office, Plaintiff returned to Morton Plant Mease Healthcare/BayCare Life Management ("BayCare"), a psychiatric treatment facility he last attended in early July 2002. The BayCare treatment notes indicate that Plaintiff returned there seeking a reevaluation for his appeal of Defendant's termination decision. The administrative record does not indicate the results of any reevaluation, if any, that took place at BayCare during this visit or any records indicating that Plaintiff renewed his treatment there.

---

3. Because of these suspicions, Plaintiff was required to undergo two independent medical examinations in July and November, 1998. Both independent medical examiners performing the evaluations concluded that he was unable to work. After these examinations, CNA extended Defendant's long-term disability benefits on a short-term basis spanning several years, receiving periodic disability updates from Plaintiff's treating physician in New Jersey, Dr. Heimbrach.

4. Defendant also transmitted and requested evaluation forms from Dr. Jo Andrews and therapist Larry Silvers, but these forms were never received.

5. Plaintiff commenced psychiatric treatment at Morton Plant Mease Healthcare/BayCare Life Management in June 2002, soon after he was contacted by Defendant and reminded of his obligation to remain under psychiatric care in order to continue receiving benefits. Plaintiff attended three weeks of group psychotherapy and then discontinued this treatment voluntarily on July 3, 2002.

6. According to Defendant, Plaintiff would need to have a GAF score of below 60 to be considered disabled. Plaintiff does not dispute this contention.

7. Defendant also noted in its letter that it never received forms from Dr. Andrews or Mr. Silvers, and that Plaintiff's previous treating physician, Dr. Heimbrach, informed its case manager that he had not treated Plaintiff for over one and a half years and did not have any updated information to provide.

Several weeks after returning to Bay-Care, Plaintiff reported to Dr. Dugger for the February 10, 2003, evaluation scheduled by Dr. Brooks. Dr. Dugger understood that she was examining Plaintiff because he had "lost his [long term disability and] wants to appeal" the termination decision. Among other things, Dr. Dugger's treatment notes indicate that Plaintiff arrived smelling strongly of alcohol, he was tearful but the "tears resolved quickly," he had a "forced appearance at times," he had not received treatment nor taken his medications for one and a half to two years, he "sat in the waiting room in no apparent distress," he did not display any pain during his forty minute visit and his thought process was coherent and logical when discussing disability. Based on her evaluation, Dr. Dugger concluded that Plaintiff was depressed but not bipolar, was intoxicated but not dependant on alcohol, and had a GAF score of 65/65.

The day after his evaluation with Dr. Dugger, Plaintiff filed his appeal of Defendant's termination decision. On appeal, Defendant considered the treatment notes of Dr. Dugger recorded during the February 10, 2003, examination, as well as additional treatment notes from her dated February 24, 2003, indicating that no psychiatric reason prevented Plaintiff from working full time. Defendant also reviewed treatment notes and reports from four other doctors: Dr. Kromolicki, Dr. Goodman, Dr. Toth, and Dr. Amar. All of these doctors provided assessments that more or less supported Plaintiff's position that he was unable to work, albeit for different reasons, different periods of time, and with different limitations.[8]

Before making its termination decision, Defendant had an independent physician consultant, Dr. Hopkins, review the entire administrative record and submit a report of her findings. After reviewing all of the medical records, including the treatment notes and/or reports from Dr. Kromolicki, Dr. Goodman, Dr. Toth, and Dr. Amar, Dr. Hopkins concluded that Plaintiff could have returned to work full-time at the sedentary level, beginning December 31, 2002. After receiving Dr. Hopkins' report, Defendant denied Plaintiff's appeal in a letter dated July 28, 2003.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

8. Dr. Kromilicki, Plaintiff's chiropractor, concluded that Plaintiff would be unable to return to work if he was required to engage in heavy lifting, needed to bend, kneel, or stoop regularly, or stand for prolonged periods of time. Dr. Goodman, a Diplomate of the American Board of Internal Medicine and Rheumatology, concluded that Plaintiff's chronic degenerative joint disease and lower back pain prevented him from returning to "any gainful employment." Dr. Toth, a psychiatrist who examined Plaintiff on May 12, 2003, concluded that Plaintiff felt overwhelmed about returning to work and his chronic depression prevented him from working for four to six months. Dr. Amar, who practices physical medicine and rehabilitative medicine, also treated Plaintiff in May 2003, and concluded that Plaintiff could not return to work as a vice president of Citibank because "he is unable to perform activities that require prolonged walking, standing, sitting, bending, or lifting ... [and] he will not be able to perform the traveling and ... handle the stress that goes with this type of job in view of his depression and bipolar disorder."

(1986). In making this determination, all facts and reasonable inferences to be drawn therefrom are to be construed in the light most favorable to the non-movant.[9] *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir.1998).

### III. Analysis

### A. ERISA Standard of Review

This Court's first step in determining whether to uphold the termination of Plaintiff's disability benefits is to identify the appropriate standard of review used to examine Defendant's decision. There are three standards of review appropriate in ERISA decisions, and the amount of deference granted to a plan administrator's decision varies considerably among these standards. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (comparing ERISA law to trust law and adapting the standards of review from trust law to fit ERISA cases). The first standard of review and the least deferential is the *de novo* standard. Courts apply this standard where an ERISA plan does not grant the plan administrator discretion to determine eligibility for benefits or to construe the terms of the plan. *See Marecek v. BellSouth Telecommunications, Inc.,* 49 F.3d 702, 705 (11th Cir.1995). If such discretion is granted to the plan administrator, an "arbitrary and capricious" standard applies. This standard is analogous to an abuse of discretion standard and is the most deferential. *See Marecek,* 49 F.3d at 705. Under the arbitrary and capricious standard, a reversal of the plan administrator's decision will only occur if no "reasonable" grounds exist to support the decision. *Williams v. BellSouth Telecommunications, Inc.,* 373 F.3d 1132, 1137–1138 (11th Cir.2004).

Finally, a "heightened arbitrary and capricious" standard applies if the plan grants the plan administrator discretion, but the Court finds that the administrator is operating under a conflict of interest. Under this standard, the Court will consider the conflict of interest in its analysis and, therefore, will exercise less discretion in its analysis. *See Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566 (11th Cir.1990) ("[W]e hold that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretations of plan provisions committed to its discretion was not tainted by self-interest.").

■ Because Citibank had delegated to Defendant the appropriate discretion of review and Defendant was not operating under a conflict of interest when it exercised its administrative authority, the appropriate standard of review in this case is the "arbitrary and capricious" standard. The Administrative Services Agreement (the "ASA") between Defendant and Citigroup sets forth the Defendant's authority as claims administrator. It provides that Defendant, as the "Named ERISA Claims Review Fiduciary," has the "final discretionary authority for determining eligibility for Plan Benefits and for interpretation of Plan Terms." *See* Administrative Services Agreement, Section 1(A)(10).[10] Addi-

---

9. Both parties have moved for summary judgment in this case. Because this Court is granting Defendant's Motion and denying Plaintiff's, Plaintiff is considered the non-moving party.

10. According to the Plan, Defendant acts as the Plan's claims administrator and fiduciary, and is responsible for reviewing disability claims and paying benefits to those participants who meet the definition of "disability." The Plan states that Defendant "assumes the responsibility and discretionary authority for approving or denying Plan Benefits" and reviewing benefits decisions through an administrative appeals process mandated by Section

tionally, the terms of the Plan make clear that the Plan is sponsored by Citibank and is self-funded, meaning that disability benefits are paid by Defendant with funds provided by Citibank, rather than with funds provided by Defendant from an underlying insurance policy. *See* Citibank Disability Benefits Plan, Art VI, Sec. 3; Administrative Services Agreement, Sec. 1(A)(13) and (17).

These are precisely the circumstances under which the "arbitrary and capricious" standard is supposed to apply, although Plaintiff disputes the application of this standard in his summary judgment motion. Plaintiff contends that the "heightened arbitrary and capricious" standard applies in this case because Defendant was operating under a conflict of interest due to the manner in which Defendant was compensated. This argument lacks merit because, *inter alia*, Defendant was compensated on a per employee basis. *See* Administrative Services Agreement, Appendix A–2. The only financial incentive or institutional bias that might possibly exist under this compensation scheme, therefore, would be one in favor of maintaining an employee's eligibility, not terminating the employee from the Plan. Accordingly, this Court will review Defendant's termination decision using the "arbitrary and capricious" standard.

### B. Defendant's Long–Term Disability Decision

 Employing the highly deferential "arbitrary and capricious" standard, this Court finds that Defendant's termination decision should be upheld. Defendant's decision to terminate Plaintiff's disability was supported by the opinions of three doctors: Dr. Brooks, Dr. Dugger, and Dr. Hopkins. Considering Dr. Brooks was Plaintiff's own personal physician who had been treating him for over a year, and Dr.

Dugger was a psychiatrist who examined Plaintiff on two separate occasions at Plaintiff's own initiative, Defendant's decision can not be characterized as arbitrary and capricious. As mentioned above, a Court may reverse an administrator's decision under this standard only if the administrator did not have reasonable grounds for its decision. *Williams,* 373 F.3d at 1138. The medical opinions of Plaintiff's own treating physicians and the independent physician consultant provided Defendant with reasonable grounds to terminate Plaintiff's disability benefits.

Under the terms of the Plan, Plaintiff was required to satisfy two conditions in order to continue receiving disability benefits. First, he had to continue to satisfy the definition of "disability," meaning that he could not engage in any "occupation or employment for wage or profit for which [he was] reasonable qualified by reason of education, training, or experience or may reasonably become qualified." Second, Plaintiff was required to continue seeking treatment for his disabling conditions.

Evidence of Plaintiff's failure to satisfy both of these conditions existed in the administrative record when Defendant made its final termination decision. Dr. Brook's completed psychological questionnaire dated January 7, 2003, indicated that Plaintiff was not currently being treated for his mental illness or taking any medication. It also revealed Dr. Brooks' conclusion that no functional or mental limitations were preventing Plaintiff from performing his job. Dr. Dugger's notes from the February 10th examination and February 24th follow-up examination reinforce Dr. Brook's conclusions. Dr. Dugger concluded that Plaintiff was malingering for benefits, that he had not received treatment nor taken medication for one and a half to two

503 of ERISA. *See* Administrative Services Agreement, Section (3).

years, that he exhibited no signs of pain during his evaluation, and that there were no psychological reasons why he was unable to work. These conclusions, coupled with Dr. Hopkins' comprehensive review of Plaintiff's medical records, provided Defendant with "reasonable grounds" for termination.

Plaintiff devotes a considerable amount of his Motion outlining events that occurred and medical opinions that were reached in earlier years to support his position that Defendant's termination decision should be reversed. This evidence is of relatively little value, however, because of the policy terms requiring continued disability and continued treatment. Plaintiff also relies on the conclusions reached by Dr. Kromolicki, Dr. Goodman, Dr. Toth, and Dr. Amar to argue that Defendant should not have terminated his benefits. As Dr. Hopkins noted, however, many of these opinions do not appear to contemplate ailments that would prevent Plaintiff from performing "any" occupation for which he was qualified, and Plaintiff has not presented any evidence why these opinions should have been given more weight than the opinions relied on by Defendant. Moreover, none of these opinions appear to contradict the statements of Dr. Brooks and Dr. Dugger that Plaintiff had ceased receiving regular treatment for the physical conditions that he claimed were preventing him from returning to work. As mentioned above, this was an express condition to the continued receipt of disability benefits.

Even assuming all of these doctors concluded that Plaintiff was unable to perform "any" occupation, the existence of contradictory medical opinions in the administrative record does not make a plan administrator's decision "arbitrary and capricious," absent convincing evidence that the medical opinions supporting the decision were unreliable. *See Jett v. Blue Cross and Blue Shield of Alabama,* 890 F.2d 1137, 1140 (11th Cir.1989) (holding that evidence contrary to an administrator's decision does not make the decision arbitrary and capricious, so long as a reasonable basis appears for the decision). Because Plaintiff has failed to demonstrate why Defendant's reliance on the opinions of Dr. Brooks, Dr. Dugger, and Dr. Hopkins was unreasonable, this Court must "avoid judicial second guessing" Defendant's termination decision. *See Williams,* 373 F.3d at 1137. Accordingly, Defendant's Motion for Summary Judgment should be GRANTED.

It is therefore ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Summary Judgment (Dkt.# 23) is **DENIED**.

2. Defendant's Motion for Summary Judgment (Dkt.# 28) is **GRANTED**.

3. The Clerk is directed to enter summary final judgment in favor of Defendant, terminate all pending motions and close this case.